# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BARBARA WOLFSON, | Case No. |
| Plaintiff, |  |
| v. | COMPLAINT |
| POSHMARK, INC., MANISH CHANDRA, NAVIN CHADDHA, JENNY MING, EBONY BECKWITH, JEFF EPSTEIN, HANS TUNG, and SERENA J. WILLIAMS, | DEMAND FOR JURY TRIAL |
| Defendants. |  |

Plaintiff Barbara Wolfson ("Plaintiff"), upon information and belief, including an examination and inquiry conducted by and through her counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for her Complaint:

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this action against Poshmark, Inc. ("Poshmark" or the "Company") and the members of Poshmark's Board of Directors (the "Board" or the "Individual Defendants," and together with the Company, "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, arising out of their agreement to be acquired by NAVER Corporation ("NAVER") through NAVER's subsidiaries Proton Parent, Inc. ("Proton Parent") and Proton Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On October 3, 2022, Poshmark and NAVER entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Poshmark stockholders will receive $17.90 in cash for each share of Poshmark common stock that they own.

3.      On November 15, 2022, Poshmark filed a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the SEC, which omits or misrepresents material information concerning the Proposed Transaction.  The failure to adequately disclose such material information renders the Proxy Statement false and misleading.

4.      The stockholder vote to approve the Proposed Transaction is forthcoming.  Under the Merger Agreement, following a successful stockholder vote, the Proposed Transaction will be consummated.  For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from conducting the stockholder vote on the Proposed Transaction unless and until the material information discussed below is disclosed to the holders of the Company's common stock, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

6.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes

whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

7.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, the Company's stock trades on The Nasdaq Global Select Market, which is also headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Poshmark.

9.      Defendant Poshmark is a Delaware corporation, with its principal executive offices located at 203 Redwood Shores Parkway, 8th Floor, Redwood City, California 94065.  Poshmark's common stock trades on The Nasdaq Global Select Market under the ticker symbol "POSH."

10.     Defendant Manish Chandra is, and has been at all relevant times, President, Chief Executive Officer, and a director of the Company.

11.     Defendant Navin Chaddha is, and has been at all relevant times, a director of the Company.

12.     Defendant Jenny Ming is, and has been at all relevant times, a director of the Company.

13.     Defendant Ebony Beckwith is, and has been at all relevant times, a director of the Company.

14.     Defendant Jeff Epstein is, and has been at all relevant times, a director of the Company.

15.     Defendant Hans Tung is, and has been at all relevant times, a director of the Company.

16.     Defendant Serena J. Williams is, and has been at all relevant times, a director of the Company.

17.     Defendants identified in paragraphs 10-16 are referred to herein as the "Board" or the "Individual Defendants," and together with Poshmark, "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

18.     Poshmark is a leading social marketplace for new and secondhand style for women, men, kids, pets, home, and more.  Combining the human connection of physical shopping with the scale, ease, and selection benefits of e-commerce, the Company makes buying and selling simple, social, and sustainable.  Poshmark's community of more than 80 million registered users across the U.S., Canada, Australia, and India is driving the future of commerce while promoting more sustainable consumption.

### B. The Proposed Transaction

19.     On October 3, 2022, Poshmark and NAVER issued a joint press release announcing the Proposed Transaction stating, in pertinent part:

SEONGNAM-SI, South Korea & REDWOOD CITY, Calif.--(BUSINESS WIRE)--Naver Corp. (KRX: 035420) ("Naver"), Korea's largest internet company, and Poshmark, Inc. (NASDAQ: POSH) ("Poshmark"), a leading social e-commerce marketplace for new and secondhand style, today announced that they have entered into a definitive agreement under which Naver will acquire all of the issued and outstanding shares of Poshmark for $17.90 in cash, representing an enterprise value of approximately $1.2 billion.  This represents a premium of 15% to Poshmark's closing stock price as of October 3, 2022, a 34% premium to the 30-day volume

weighted average price, and a 48% premium to the 90-day volume weighted average price of Poshmark's shares.

**Management Commentary**

Choi Soo-Yeon, Chief Executive Officer of Naver:

> "The combination will create the strongest platform for powering communities and re-fashioning commerce. Poshmark is the definitive brand for fashion in the United States that provides a social network for buying and selling apparel. Naver's leading technology in search, AI recommendation and e-commerce tools will help power the next phase of Poshmark's global growth."

> "Poshmark is a natural fit for our business – our two companies share a common set of values and vision around content, community and empowerment. Bringing Naver and Poshmark together will immediately put us at the forefront of creating a new, socially responsible, and sustainable shopping experience designed around sellers of all sizes and interests – from individual and influencer sellers to professional sellers, brands and specialty boutiques – and a large, loyal, and highly engaged social community. We are excited to work closely with Manish and his talented team to create lasting value for all our stakeholders."

Manish Chandra, Founder and Chief Executive Officer of Poshmark:

> "The opportunity to join forces with Naver – one of the world's leading and most innovative and successful internet companies – is a testament to the strength of our brand, operating model, and what we've built over the last decade with our talented team and amazing community. Our industry continues to evolve at a rapid pace, and we are excited to continue to lead the future of shopping by providing our community with an unparalleled experience that is simple, social, fun and sustainable."

> "This is a highly compelling opportunity for our employees, who will benefit from being part of a larger, global organization with shared values and complementary strengths. This transaction also delivers significant and immediate value to our shareholders. Longer term, as part of Naver, we will benefit from their financial resources, significant technology capabilities, and leading presence across Asia to expand our platform, elevate our product and user experiences, and enter new and large markets. I look forward to partnering with Naver as we take our company into its next phase of growth."

**Redefining Commerce and Community Around a Shared Vision**

The inherent strengths of both companies lie in their unwavering commitment to content, community and empowerment:

- **Content**.  Naver is home to the largest number of bloggers in Korea and the largest number of digital creators of stories (Wattpad) and comics (Webtoons) globally.  Poshmark is a leader in creating unique styles and fashion trends, including the growing K-Fashion apparel segment.
- **Community**.  Naver is the largest and longest-standing online community in Korea, where more than 36 million monthly users access its search portal and various online community services.  Its metaverse platform, Zepeto, is the second largest metaverse app in the world, with a growing, vibrant community for members to create and share whatever they imagine.  Naver's community also extends to other large, fast-growing, and highly engaged groups, including its K-Pop fandom community Weverse, which is jointly owned with BTS' management company, one of the most successful groups of all time.  Poshmark is the destination of choice for more than 80 million registered users.  Among them, active users spend approximately 25 minutes of their day buying and selling apparel online, and gather in-person at Posh Party Live events held in various cities around the world.
- **Empowerment**.  Naver is dedicated to empowering the long tail – it is the largest enabler of e-commerce for small and medium-sized businesses in Korea and has revolutionized content creation by democratizing the publication of digital comics through Naver Webtoons.  At Poshmark, anyone can easily list and sell what is hanging in their closet at home, and anyone can make a social impact through the promotion of socially responsible, sustainable commerce.

The transaction will create a global player in online fashion re-commerce by combining Poshmark's unique discovery-based social shopping platform and deeply engaged community with Naver's technological prowess in upleveling the e-commerce experience.  Poshmark will also leverage Naver's proven expertise and track record in Asia and its significant expertise from backing and investing in other fashion and consumer-to-consumer (C2C) e-commerce platforms globally.

The combination accelerates Naver's strategy to build a global e-commerce community portfolio to capture the growth in large markets around the world, including Poshmark's home market of North America.  Together, the companies expect to increase purchase conversion rates, deepen user engagement, create an industry leader in livestreaming commerce, and enhance the unique relationship- and discovery-based experiences that are driving fast-growing re-commerce verticals.

**Strategic and Financial Benefits**

- **Expands Long-Term Opportunity in Fashion Re-commerce and Creates Globally Distributed User Base with Influx of Younger Users**: The addition of Poshmark will expand and diversify Naver's search-driven

e-commerce business into the global secondhand C2C market for fashion. The combination will also allow Naver to capitalize on the increasing consumer shift in fashion to online re-commerce, which is an $80 billion market today in the U.S. alone, and is expected to grow by 20% annually to $130 billion by 2025.

Poshmark currently has a community of over 80 million registered users, across 90% of zip codes in the U.S.  In 2021, the company generated approximately $2 billion in gross merchandise value (GMV) with a take rate of 20% and gross margin of 85%. Its primary demographic of millennials and Generation Z users is the largest shopping demographic for secondhand goods and a key driver of the circular economy and community-based platforms.  One of Poshmark's strong appeals to the growing number of conscious consumption shoppers is the important role it plays in extending the lifecycle of millions of previously made items and reducing fashion's footprint.  These users will expand and complement Naver's current user base.

- **Creates a Global Commerce Community with Access to Poshmark's Social Networking and Discovery-Based Shopping**: Naver is a proven community builder, connecting more than 28 million monthly users across its Naver Café platform – an open social community where users create their own groups to share content, ideas, and information broadly, across a large number of topics and categories – as well as its Metaverse and K-Pop fandom communities.  Poshmark has created unique relationship-oriented "micro" communities that are based around social engagement with friends and family and discovery-based shopping.  Poshmark's simple, easy, and community-centered fashion marketplace will give Naver access to a highly engaged and diversified community, where sellers become buyers and buyers become sellers, and add a global social networking element to Naver's portfolio of services.
- **Enhances Poshmark's User Experience with Naver's Unrivaled and Innovative Technology Offerings**: Poshmark will instantly benefit from Naver's deep technology stack and AI-based capabilities, including its smart lens image recognition and search technologies.  These capabilities are highly complementary to Poshmark's product development strategy, and together will allow Poshmark to offer a new search and shopping experience by integrating Naver's shopping search engine, which allows users to enter additional search keywords according to their preference on colors, designs, and materials.  Specifically, with access to Naver's image recognition technology, Poshmark users will be able to identify where to find and buy products by scanning objects and shopping through the camera on their phones without needing to know the exact name of the product. This capability will make it easier to both identify new products and sell items, enhancing the user experience.

- **Leverages Naver's Proven Data Analytics Technology to Improve Marketing and Engagement Strategies to Make Poshmark the Platform of Choice for Buyers and Sellers**: As the largest advertising platform in Korea, Naver's ad-serving infrastructure will play an instrumental role as Poshmark explores rolling out ads to its deeply engaged community. For instance, Poshmark will be able to leverage Naver's "Biz Advisor" and "Analytics" AI analytical tools, which analyze sales statistics to manage data more effectively, and in turn, increase the number of sellers on Poshmark's platform. These enhancements will dramatically advance Poshmark's service offering, resulting in greater customer acquisition, retention, and buyer conversion, as well as enhance its community engagement and user experiences. With Naver Pay commanding the largest share of online payment processing in Korea, the combination will also enable Poshmark to develop innovative payment solutions to expand its ecosystem of buyers and sellers. Additionally, with Naver's technologies, Poshmark will be able to provide more suitable product recommendations for customers after analyzing products, user communities, and the closets of the users' favorite sellers in real-time. Together, the companies can develop a service that allows users to search with shopping keywords so that the most suitable product will be recommended to the right user.

- **Enables Global Live Commerce Adoption**: Livestream shopping is a key driver of e-commerce in China and Korea (and increasingly in the U.S.) today, allowing shoppers to buy products in real-time through live video broadcasts, enabling greater insights and more clarity around purchasing decisions. Naver's Shopping Live solution is the leader in Korea, one of the world's largest live shopping markets, and an essential feature of Naver's e-commerce platform with over $25 billion in GMV transacted in 2021. Naver expects that the enablement and enhancement of live streaming capabilities within the Poshmark platform will transform the shopping and selling experience and strengthen Poshmark's community by allowing for greater social networking and engagement.

- **Further Expands Global Footprint for Both Naver and Poshmark**: Poshmark will benefit from Naver's global presence in high-growth markets, particularly in Korea, one of the world's most innovative and highest penetrated e-commerce industries. This is where Naver is the leading search engine and largest e-commerce channel, and the only search technology company in the world that has successfully expanded into an e-commerce platform. Naver's footprint also includes Japan, where it has joint ownership in Z Holdings, one of the world's largest internet service groups, with assets such as Yahoo! Japan and Japan's leading smartphone messaging platform, LINE, which Naver created and launched in 2011 and now operates in over 230 countries and is used by more than 70% of those populations. With Naver's support, Poshmark will pursue a broader international expansion strategy in the medium-term, including into other developed markets in Asia.

In addition, this transaction provides Naver with an enhanced foothold in the U.S., expanding its international profile, which it has steadily increased both organically and through investments over the past 20 years. Naver will build on its existing U.S. footprint, including Webtoon Entertainment, which is based in Los Angeles and extremely popular with younger audiences, and its $600 million acquisition of Wattpad in 2021. Naver has benefited from the recent global digital disruption and transformation of media and publishing through Wattpad and Webtoon Entertainment, and looks to extend their growth in the region with the addition of Poshmark.

- **Significant Synergy Potential**: The transaction is expected to generate significant revenue and cost synergies, consisting primarily of:
  - Re-acceleration of annual revenue growth beyond 20% in the near-term by leveraging Naver's advertising capabilities to drive further monetization, accelerating investment to drive growth overseas, and expanding live commerce adoption.
  - Approximately $30 million in run-rate annual cost savings within 24 months post-closing including through rationalization of public company costs and driving of higher operating leverage across operating and other cost functions.

**Operating Structure and Leadership**

Upon completion of the transaction, Poshmark will become a standalone U.S. subsidiary of Naver and will continue to be led by CEO Manish Chandra and Poshmark's current management team.

Poshmark will continue to operate under its existing brand, as well as maintain its employee base, Poshmark community, and headquarters in Redwood City, California.

**Transaction Details**

The transaction, which was unanimously approved by both Naver's and Poshmark's Boards of Directors, is expected to close by the first quarter of 2023, subject to approval by Poshmark stockholders and the satisfaction of certain other customary closing conditions. The transaction is not contingent on any financing.

Naver has secured voting and support agreements with certain stockholders of Poshmark, representing approximately 77% of the outstanding voting power of Poshmark common shares.

The transaction is expected to be funded with Naver's cash balances and other existing financing sources.

**C. False and Misleading Statements and/or Material Omissions in the Proxy Statement**

20.     On November 15, 2022, Defendants filed the materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Poshmark's stockholders.  Designed to convince the Company's stockholders to vote in favor of the Proposed Transaction, the Proxy Statement is rendered misleading by the omission of critical information.

21.     Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

22.     First, the Proxy Statement omits material information or provides materially misleading information regarding the Company's financial projections.  Specifically, the Proxy Statement fails to disclose the line items underlying the Company's: (i) Gross Profit; (ii) Adjusted EBITDA; and (iii) Unlevered Free Cash Flow.

23.     Courts have routinely held management's financial projections are among the most important information a stockholder can have when evaluating the proposed consideration in a merger.  See Brown v. Brewer, No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863, at *70 (C.D. Cal. June 17, 2010) (denying defendants' motion for summary judgment on the issue of management's financial projections, the court held that "A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued. [T]here is a substantial likelihood that a reasonable shareholder would consider it important in making his decision.") (brackets in original) (internal quotation marks omitted); In re Netsmart Techs., Inc., S'holders Litig., 924 A.2d 171, 203 (Del. Ch. 2007)

(company's financial projections "are probably among the most highly-prized disclosures by investors"); In re Staples, Inc. S'holders Litig., 792 A.2d 934, 958 n.44 (Del. Ch. 2001) ("One suspects that the projections are the information that most stockholders would find the most useful to them.").  See also SEC v. Nat'l Student Mktg. Corp., 457 F. Supp. 682, 707 (D.D.C. 1978) (quoting Republic Technology Fund, Inc. v. Lionel Corp., 483 F.2d 540, 547 (2d Cir. 1973)) ("In a merger transaction such as that presented here, accurate financial information is necessary in order for a shareholder fairly to be able to vote.").

24.     Second, the Proxy Statement omits material information regarding the financial analyses performed by the Company's financial advisor Goldman Sachs & Co. LLC ("Goldman").

25.     With respect to Goldman's Illustrative Present Value of Future Share Price Analysis, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying the discount rate of 15.0%.

26.     With respect to Goldman's Illustrative Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying the discount rates of 12.5% to 15.0%; and (ii) the net present value of cash tax savings from federal net operating loss carryforward.

27.     With respect to Goldman's Premia Analysis, the Proxy Statement fails to disclose the specific transactions observed and the acquisition premia for each of the transactions observed.

28.     Third, The Proxy Statement fails to disclose material information relating to the background of the Proposed Transaction.

29.     For example, the Proxy Statement sets forth that in connection with the sale process the Company entered into confidentiality agreements with interested parties that contained standstill provisions.  The Proxy Statement fails, however, to disclose whether any of the standstill

restrictions are still in effect and the specific conditions under which any standstill provision would fall away.

30.     The omission of the above-referenced material information renders the following sections of the Proxy Statement false and misleading: "Certain Financial Projections," "Opinion of Goldman Sachs," and "Background of the Merger."

## COUNT I

### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

31.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

32.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

33.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act.  Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction.  The Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

34.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote

on the Proposed Transaction.

35.     By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

36.     Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

37.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth in full.

38.     The Individual Defendants acted as controlling persons of Poshmark within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Poshmark, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

39.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

40.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations

as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

41.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

42.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

43.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, Poshmark's stockholders will be irreparably harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Poshmark stockholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages to Plaintiff;

C.      Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange

Act, as well as SEC Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for

Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated:  November 29, 2022                          Respectfully submitted,

                                      By   /s/ *Shallom Engel*
                                           Shallom Engel
                                           **Engel Law PLLC**
                                           2329 Nostrand Avenue, Suite 100
                                           Brooklyn, NY 11210
                                           Telephone: (718) 880-8595
                                           Email: shallom@engellawpllc.com

                                           *Attorneys for Plaintiff*